# IN THE SUPREME COURT OF IOWA

No. 09–0064

Filed October 28, 2011

**STATE OF IOWA,**

>   Appellee,

vs.

**RANDALL LEE PALS,**

>   Appellant.

_____

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Worth County, Bryan H. McKinley (motion to suppress), John S. Mackey (bench trial) and Colleen D. Weiland (sentencing), Judges.

Defendant appeals conviction and argues marijuana found in his vehicle after search during traffic stop should have been suppressed. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**

Mark C. Smith, State Appellate Defender, and Bradley M. Bender, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Kevin R. Cmelik, Assistant Attorney General, and Jeffrey H. Greve, County Attorney, for appellee.

**APPEL, Justice**.

Randall Pals' vehicle was searched during a traffic stop and the police officer discovered marijuana. Pals moved to suppress the evidence, challenging the legality of the traffic stop and search under the search and seizure clauses of the Iowa and Federal Constitutions. The district court denied the motion to suppress, and Pals was convicted at a bench trial of possession of a controlled substance in violation of Iowa Code section 124.401(5) (2007). Pals appealed, arguing the district court erred in denying his motion to suppress. The court of appeals affirmed. We granted further review. For the reasons expressed below, we vacate the decision of the court of appeals, reverse the judgment of the district court, and remand for further proceedings.

### I. Background Facts and Prior Proceedings.

On August 18, 2007, Worth County Deputy Sheriff Mark Wubben received a complaint that two dogs, a Brittany spaniel (Brittany) and a Labrador retriever (Lab), were running loose in Joice, Iowa. Wubben observed the dogs running loose and noticed they did not have tags or collars. While he was looking for the dogs, Wubben saw a white truck with a red topper driving around that appeared to be searching for the dogs. Wubben spoke to a friend of Randall Pals who advised him that the dogs belonged to Pals. Wubben was unable to locate the dogs or Pals at that point, so he left town and headed toward Rice Lake.

On the highway, Wubben encountered Pals' truck coming from the opposite direction. He ran the plates and confirmed the truck belonged to Pals. Wubben began to follow Pals and noticed the Brittany in the back of the truck, but he did not see the Lab. Wubben pulled Pals over to advise Pals that the dogs needed tags and collars and that a Joice municipal ordinance prohibited dogs running at large.

Wubben remarked, "I see you found one of them before I did" to Pals, and Pals acknowledged the two dogs belonged to him. Pals said he recovered both dogs and explained that the Lab was in a kennel in the back of the truck. Wubben testified the kennel was not visible from outside of the truck and he never saw the Lab before stopping Pals' vehicle.

Wubben requested Pals' driver's license and went back to his patrol car where he contacted his lieutenant. Wubben was advised to provide a verbal warning about the dogs. Wubben returned to Pals' vehicle and asked for proof of insurance, which Pals was unable to produce. Wubben then asked Pals to come back to his patrol car.

Pals sat in the front passenger seat of Wubben's patrol car. Wubben told Pals that Pals needed to update his address on his driver's license. Wubben explained the need for tags and collars on the dogs and gave Pals a verbal warning. He also discussed the necessity of having proof of insurance in the vehicle and explained that Pals would alleviate the need for a no-insurance ticket if Pals would call the sheriff's office with his insurance policy number and expiration date. Pals agreed to do so.

Wubben then asked Pals, "Say you don't have anything, any weapons or drugs or anything like that in your vehicle, do you? Do you care if I take a look?" Wubben testified that Pals said, "[S]ure, go ahead." Wubben and Pals exited the patrol car and approached Pals' vehicle. Wubben began the search and, within two minutes, discovered a half gram of marijuana in the truck. At the conclusion of the search, Pals was handcuffed, advised of his *Miranda* rights, and placed under arrest.

Pals was charged with possession of a controlled substance, marijuana, a serious misdemeanor, in violation of Iowa Code section

124.401(5). Pals filed a motion to suppress the evidence, claiming: (1) he was still seized at the time of the search and the consent was not voluntarily given, and (2) Wubben lacked probable cause and exigent circumstances to search the vehicle. The district court denied the motion to suppress and subsequently found Pals guilty of possession of a controlled substance. Pals appealed, and the court of appeals affirmed the conviction. Pals sought further review, which we granted.

## II. Scope of Review.

Pals argues the district court should have granted his motion to suppress on federal and state constitutional grounds. Therefore, this court's review is de novo. *State v. Lane*, 726 N.W.2d 371, 377 (Iowa 2007). This review requires "an independent evaluation of the totality of the circumstances as shown by the entire record." *State v. Turner*, 630 N.W.2d 601, 606 (Iowa 2001) (internal quotation marks omitted). The court gives "deference to the factual findings of the district court due to its opportunity to evaluate the credibility of the witnesses, but [is] not bound by such findings." *Lane*, 726 N.W.2d at 377.

## III. Issues Presented.

Pals presents three search and seizure claims in this appeal.[1] Pals first challenges the constitutionality of a traffic stop that is supported only by reasonable suspicion of a completed civil infraction. Second, Pals suggests that there were no articulable facts to give rise to reasonable suspicion of some separate illegal activity that would justify the request to search Pals' vehicle. Third, Pals asserts that, even if the traffic stop was valid, his consent to the search of his car cannot be

---

[1]Pals also asserts that he received ineffective assistance of counsel when his trial counsel failed to file a motion to dismiss on speedy trial grounds. Because we reverse the district court's judgment on other grounds, we need not address this issue. *See State v. Bogan*, 774 N.W.2d 676, 684 (Iowa 2009).

considered free and voluntary because it was coerced under the facts and circumstances presented in this case.

Pals brings these claims under both the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution. While these provisions use nearly identical language and were generally designed with the same scope, import, and purpose, we jealously protect this court's authority to follow an independent approach under our state constitution. *State v. Ochoa*, 792 N.W.2d 260, 267 (Iowa 2010). In *Ochoa*, we explained:

> [W]hile United States Supreme Court cases are entitled to respectful consideration, we will engage in independent analysis of the content of our state search and seizure provisions. . . . The degree to which we follow United States Supreme Court precedent, or any other precedent, depends solely upon its ability to persuade us with the reasoning of the decision.

*Id.* Our approach to independently construing provisions of the Iowa Constitution that are nearly identical to the federal counterpart is well supported in our case law and the law of other jurisdictions. *See, e.g., Ochoa*, 792 N.W.2d at 267; S*tate v. Cline*, 617 N.W.2d 277, 285 (Iowa 2002), *overruled on other grounds by Turner*, 630 N.W.2d at 606. Even where a party has not advanced a different standard for interpreting a state constitutional provision, we may apply the standard more stringently than federal case law. *State v. Bruegger*, 773 N.W.2d 862, 883 (Iowa 2009). When, as here, a defendant raises both federal and state constitutional claims, the court has discretion to consider either claim first or consider the claims simultaneously. *Ochoa*, 792 N.W.2d at 267.

**IV. Merits.**

**A. Introduction.** The question of permissible scope of searches and seizures by law enforcement in the context of minor infractions is a major issue in criminal law today. The proper scope of police authority in the context of routine traffic stops has been the subject of countless commentaries,[2] many cases,[3] and a number of consent decrees.[4] In particular, use of minor traffic infractions as a springboard to consent searches has generated charges of abuse and racial profiling.[5] Alleged abuses by law enforcement authorities in the context of traffic stops have led to calls for major reform of police practices and even the abandonment of consent searches as a result of vehicle stops altogether.

A number of jurisdictions have entered into consent decrees that provide a framework to control the exercise of police authority during

[2]*See, e.g.*, David A. Harris, *"Driving While Black" and All Other Traffic Offenses: The Supreme Court and Pretextual Traffic Stops*, 87 J. Crim. L. & Criminology 544 (1997); Eamon Kelly, *Race, Cars and Consent: Reevaluating No-Suspicion Consent Searches*, 2 DePaul J. for Soc. Just. 253 (2009) [hereinafter Kelly]; Wayne R. LaFave, *The "Routine Traffic Stop" from Start to Finish: Too Much "Routine," Not Enough Fourth Amendment*, 102 Mich. L. Rev. 1843 (2004); David A. Sklansky, *Traffic Stops, Minority Motorists, and the Future of the Fourth Amendment*, 1997 Sup. Ct. Rev. 271 (1997); George C. Thomas III, *Terrorism, Race and a New Approach to Consent Searches*, 73 Miss. L.J. 525 (2003); Robert H. Whorf, *Consent Searches Following Routine Traffic Stops: The Troubled Jurisprudence of a Doomed Drug Interdiction Technique*, 28 Ohio N.U. L. Rev. 1 (2001); Erica Flores, Comment, *"People, Not Places": The Fiction of Consent, the Force of the Public Interest, and the Fallacy of Objectivity in Police Encounters with Passengers During Traffic Stops*, 7 U. Pa. J. Const. L. 1071 (2005).

[3]*See* Thomas Fusco, Annotation, *Permissibility Under Fourth Amendment of Detention of Motorist by Police, Following Lawful Stop for Traffic Offense, to Investigate Matters Not Related to Offense*, 118 A.L.R. Fed. 567 (1994) (collecting cases).

[4]*See* Consent Decree at 12, *Wilkins v. Md. State Police*, Civil Action No. CCB-93-468 (D. Md. 2003), *available at* http://www.clearinghouse.net/chDocs/public/PN-MD-0003-0012.pdf; Consent Decree at ¶ 28, *U.S. v. New Jersey*, Civil No. 99-5970(MLC) (D.N.J. 1999), *available at* http://www.nj.gov/oag/jointapp.htm.

[5]Studies in Illinois, Rhode Island, Minnesota, and by the Department of Justice have all shown that minority drivers are the subjects of consent searches at a far higher rate than whites even though consent searches of whites are more likely to produce contraband. *See* Kelly, 2 DePaul J. for Soc. Just. at 273–75.

traffic stops. The consent decrees are variable. Some have prohibited law enforcement from seeking consent to search as a result of minor traffic infractions.[6] Others have allowed consent searches if there is particularized suspicion.[7] In some jurisdictions, reporting requirements have been imposed to inhibit the development of arbitrary police practices.[8] In Iowa, one municipality has entered into a confidential settlement with the Iowa Civil Rights Commission related to alleged racial profiling in traffic stops.[9] In addition to consent decrees, a number of jurisdictions have initiated limitations on consent searches pursuant to traffic stops as a matter of policy.

This case involves a stop to investigate an ongoing minor infraction of a municipal ordinance. Although it does not involve a stop for a minor

[6]For example, in 2003, the California Highway Patrol (CHP) reached a class action settlement in a case alleging racial profiling. The agreement required the CHP to extend its self-imposed, preexisting moratorium on consent searches for an additional three years. Terms and Conditions of Settlement Agreement at 6, *Rodriguez v. Cal. Highway Patrol*, Case No. C 99-20895-JF/HRL (N.D. Cal. 2003), *available at* www.aclunc.org/cases/landmark_cases/asset_upload_file723_6239.pdf; *see also* David John Housholder, *Reconciling Consent Searches and Fourth Amendment Jurisprudence: Incorporating Privacy Into the Test for Valid Consent Searches*, 58 Vand. L. Rev. 1279, 1302–03 (2005).

[7]*See, e.g.*, Consent Decree at ¶ 28, *U.S. v. New Jersey*, Civil No. 99-5970(MLC) (D.N.J. 1999), *available at* http://www.nj.gov/oag/jointapp.htm (providing that the New Jersey State Police would request consent to search a motor vehicle "only where troopers can articulate reasonable suspicion that a search would reveal evidence of a crime").

[8]Consent Decree at 7, *Wilkins v. Md. State Police*, Civil Action No. CCB-93-468 (D. Md. 2003), *available at* http://www.clearinghouse.net/chDocs/public/PN-MD-0003-0012.pdf.

[9]Press Release, Iowa Civil Rights Commission, Racial Profiling Complaint Ends in Settlement with Iowa Law Enforcement Agency (April 13, 2011), *available at* www.state.ia.us/government/crc/docs/RacialProfilingApril2011.pdf. Iowa law enforcement authorities are aware of the problem of racial profiling and have taken measures to address the issue. In 2004, the Iowa Department of Public Safety held a series of community meetings regarding racial profiling. Iowa Department of Public Safety, *Iowa's Highways and Racial Profiling: Community Conversations* 5 (2004), *available at* http://www.dps.state.ia.us/commis/pib/Releases/2004/full_report.pdf. The Department subsequently developed a number of recommendations to address the public's concerns of racial profiling in Iowa. *Id.* at 14–15.

traffic violation, many of the concerns that arise in the setting of a routine traffic stop apply here with equal force. We consider the issues with due regard to the legitimate needs of law enforcement, but with a recognition that our constitutional limitations on searches and seizures by law enforcement protect fundamental values of liberty and human dignity and are a bulwark against arbitrary governmental intrusions into the lives of citizens.

**B. Legality of the Initial Stop.** We first consider the legality of the initial stop in this case. Pals was stopped in his vehicle by Wubben based on the officer's belief that Pals was violating a Joice municipal ordinance. Pals argues Wubben was without authority to detain him initially because he was suspected only of violating a minor civil infraction—allowing his dogs to run loose—and because the civil infraction was already completed. The State contends Wubben had an objectively reasonable basis to believe the infraction was ongoing because he only saw one of Pals' two dogs in the truck.

"The Fourth Amendment's protection against unreasonable intrusions on a person's liberty arises when an officer seizes a person." *State v. Reinders*, 690 N.W.2d 78, 82 (Iowa 2004) (internal quotation marks omitted). "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision" and therefore must be reasonable under the circumstances. *Whren v. United States*, 517 U.S. 806, 809–10, 116 S. Ct. 1769, 1772, 135 L. Ed. 2d 89, 95 (1996). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Id.* at 810, 116 S. Ct. at 1772, 135 L. Ed. 2d at 95. Pals was not accused of

violating a civil traffic law, however. Instead, Pals was suspected of violating a Joice municipal ordinance.

Under certain circumstances, police may detain persons in the absence of probable cause if the police have reasonable suspicion to believe criminal activity is taking place. In *Terry v. Ohio*, 392 U.S. 1, 20–27, 88 S. Ct. 1868, 1879–83, 20 L. Ed. 2d 889, 905–09 (1968), the Supreme Court applied a balancing test, weighing the individual's right to autonomy and freedom against the government's interest in effective crime prevention and detection and in the officers' need to protect themselves. The Court held police may seize a person on less than probable cause when they suspect the person is about to commit a crime. *Terry*, 392 U.S. at 23, 88 S. Ct. at 1881, 20 L. Ed. 2d at 907.

Under *Terry*, police may stop a moving automobile in the absence of probable cause to investigate a reasonable suspicion that its occupants are involved in criminal activity. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 881, 95 S. Ct. 2574, 2580, 45 L. Ed. 2d 607, 616–17 (1975). The Court has also held that police may stop an automobile based on reasonable suspicion to investigate a serious past crime. *United States v. Hensley*, 469 U.S. 221, 229, 105 S. Ct. 675, 680, 83 L. Ed. 2d 604, 612 (1985).

Pals argues that, because a violation of the dogs-on-the-loose ordinance was not a serious crime or felony, he could not be stopped by Wubben for its violation. He points to the language of *Hensley*, which states:

> We need not and do not decide today whether *Terry* stops to investigate all past crimes, however serious, are permitted. It is enough to say that, if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is

> wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion.

*Id.* Pals' contention is that Wubben's stop was improper because reasonable suspicion of a completed civil infraction is insufficient to justify a seizure under the Federal and Iowa Constitutions.

Federal courts are divided on the issue of whether the Fourth Amendment per se prohibits police from stopping a vehicle based only on reasonable suspicion of a completed misdemeanor or civil infraction. *Compare Gaddis ex rel. Gaddis v. Redford Twp.*, 364 F.3d 763, 771 n.6 (6th Cir. 2004) (holding police may not make a stop with only reasonable suspicion of a "mere completed misdemeanor"), *with United States v. Hughes*, 517 F.3d 1013, 1017–18 (8th Cir. 2008) (applying a balancing test), *and United States v. Grigg*, 498 F.3d 1070, 1081 (9th Cir. 2007) (same). However, even those courts that apply a balancing test often find reasonable suspicion of a completed misdemeanor to be insufficient to justify a stop under the Fourth Amendment. *See, e.g.*, *Hughes*, 517 F.3d at 1018 (concluding reasonable suspicion of completed trespass—a misdemeanor under state law—insufficient to justify *Terry* stop); *Grigg*, 498 F.3d at 1081–82 (holding unreasonable a traffic stop based on a complaint that the driver had been playing his stereo at an excessive volume earlier in the day).

We need not address this issue, however, because Pals was not pulled over based on reasonable suspicion of a *completed* civil infraction. Instead, Pals was detained based on probable cause of an *ongoing* civil infraction. It is well settled that a police officer may pull over a car based on probable cause of an ongoing civil infraction. *See Whren*, 517 U.S. at 810, 116 S. Ct. at 1772, 135 L. Ed. 2d at 95. Probable cause exists where " 'the facts and circumstances within [the officer's] knowledge and

of which [he] had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S. Ct. 1302, 1310–11, 93 L. Ed. 1879, 1890 (1949) (quoting *Carroll v. United States*, 267 U.S. 132, 162, 45 S. Ct. 280, 288, 69 L. Ed. 543, 555 (1925)); *see also State v. Freeman*, 705 N.W.2d 293, 298 (Iowa 2005) ("Probable cause is present 'if the totality of the circumstances as viewed by a reasonable and prudent person would lead that person to believe that a crime has been or is being committed and that the arrestee committed or is committing it.' " (quoting *State v. Bumpus*, 459 N.W.2d 619, 624 (Iowa 1990))).

Wubben had probable cause to believe Pals was committing an ongoing violation of the municipal ordinance. Wubben observed the dogs running around town, observed Pals' truck appearing to search for the dogs, spoke to a friend of Pals who confirmed the dogs belonged to Pals, and later observed only one of the dogs in the back of Pals' truck.

Pals argues the record shows the infraction was completed because Wubben is heard on the recording of the stop stating, "I saw him uptown scooping them up." Wubben testified at the hearing he saw only the Brittany in the back of the truck and not the Lab. When Wubben first approached Pals' truck, he stated, "I see you found one of them before I did." Pals replied that he had recovered both dogs and both were in the back of his truck. Wubben followed up and asked specifically about the Lab, and Pals stated the dog was in a kennel in the back. Wubben testified that the kennel was not visible and that he never actually saw the Lab before stopping Pals' vehicle. Based on this record, Wubben saw only one of the dogs in the truck at the time of the stop and

consequently, did not know the location of the other dog that had been wandering around town in violation of the civil ordinance.

We therefore conclude that Wubben had probable cause under the Fourth Amendment to believe that an ongoing civil offense was occurring with respect to the Lab. We find the federal authorities cited above persuasive and come to the same conclusion with respect to Pals' state constitutional claim under article I, section 8 of the Iowa Constitution.

**C. Legality of Expansion of Seizure for Investigation Unrelated to Purposes of Stop.** In *Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S. Ct. 3138, 3150, 82 L. Ed. 2d 317, 334 (1984), the Supreme Court concluded that a traffic stop was more analogous to a *Terry*-type stop than a formal arrest. As a result, the federal courts and many state courts have sought to apply *Terry* principles in evaluating searches and seizures arising from traffic stops.

In *Terry*, the Supreme Court emphasized that even a frisk for weapons, which takes only a few seconds, is "a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment." *Terry*, 392 U.S. at 17, 88 S. Ct. at 1877, 20 L. Ed. 2d at 903. As a result, *Terry* emphasized that "[t]he scope of the search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." *Id.* at 19, 88 S. Ct. at 1878, 20 L. Ed. 2d at 904 (quoting *Warden v. Hayden*, 387 U.S. 294, 310, 87 S. Ct. 1642, 1652, 18 L. Ed. 2d 782, 794 (1967) (Fortas, J., concurring)). As a result, under traditional application of the exclusionary rule, "evidence may not be introduced if it was discovered by means of a seizure and search which were not reasonably related in scope to the justification for their initiation." *Id.* at 29, 88 S. Ct. at 1884, 20 L. Ed. 2d at 910.

The scope of search and seizure limitations frequently arises where law enforcement has no reasonable suspicion to believe that criminal activity unrelated to the purposes of the underlying stop is afoot but the police expand their inquires into unrelated subjects. The federal courts are divided on the issue. Some federal circuit courts have held that reasonable suspicion of criminal activity for matters outside the scope of the purposes of a traffic stop is not required as long as the duration of the stop is not extended. *See, e.g., United States v. Olivera-Mendez*, 484 F.3d 505, 510 (8th Cir. 2007) (upholding drug inquiry during traffic stop when duration of stop not extended); *United States v. Hernandez,* 418 F.3d 1206, 1209 n.3 (11th Cir. 2005). Other circuits, however, have taken a somewhat different view. *See, e.g., United States v. Blair*, 524 F.3d 740, 752 (6th Cir. 2008) (stating *Terry*-type stop must be reasonably related in scope to the circumstances which justified the interference in the first place); *United States v. Henderson*, 463 F.3d 27, 45 (lst Cir. 2006) (holding the scope and duration must be reasonably related to the purpose of the vehicle stop).

Cases considering whether *Terry*-type limitations apply with respect to consent searches during traffic stops under state constitutional search and seizure provisions are mixed. The cases from a substantial number of state courts support the proposition that a seizure pursuant to a traffic stop must be limited in scope and that any effort to obtain consent for a search unrelated to the purpose of the stop requires at least reasonable suspicion of criminal activity. *See, e.g., Brown v. State*, 182 P.3d 624, 634 (Alaska Ct. App. 2008); *State v. Estabillio*, 218 P.3d 749, 757–61 (Haw. 2009); *Commonwealth v. Torres*, 674 N.E.2d 638, 641–43 (Mass. 1997); *State v. Fort*, 660 N.W.2d 415, 419 (Minn. 2003); *State v. Carty*, 790 A.2d 903, 908–09 (N.J.)*, modified*, 806 A.2d 798 (N.J.

2002); *State v. McClendon*, 517 S.E.2d 128, 132 (N.C. 1999); *McGaughey v. State*, 37 P.3d 130, 137–41 (Okla. Crim. App. 2001); *State v. Cunningham*, 954 A.2d 1290, 1298–1301 (Vt. 2008). These cases cite the fear of potential abuse of traffic stops as nearly all vehicles, if followed for any substantial amount of time, commit minor traffic offenses that could serve as a springboard to intrusive consent searches.

Other states, however, have declined to impose a requirement that officers have reasonable suspicion unrelated to the traffic stop before they may request consent to search the vehicle. *See, e.g., State v. Jenkins*, 3 A.3d 806, 826 (Conn. 2010); *State v. Snell*, 99 P.3d 191, 193 (Mont. 2004); *State v. Carbo*, 864 A.2d 344, 346 (N.H. 2004). These cases generally follow the federal approach in holding that consent searches in the context of traffic stops are valid provided that the duration of the seizure is not materially extended.

In light of the substantial split of authority over the issue of the proper scope of searches in the context of automobile stops, we requested supplemental briefing from the parties on the issue. In its response, the State argues that the issue was not properly preserved. In the district court, the defendant framed the issue as whether there was probable cause to conduct the search. The district court did not address the probable cause issue, finding that the consent was valid. Under the circumstances, the State argues that it was deprived of an evidentiary opportunity to present evidence that there was, in fact, sufficient particularized suspicion to support the search. *See DeVoss v. State*, 648 N.W.2d 56, 63 (Iowa 2002). In light of the substantial question of preservation of error, we decline to address the issue.

**D. Voluntariness of Consent.** Pals argues that the district court erred in denying his motion to suppress because his consent to search

the vehicle was involuntary. Specifically, Pals asserts that the totality of the circumstances, particularly the coercive nature of the traffic stop, demonstrate that his consent was not the product of a free and unconstrained choice. We agree with Pals.

1. *Approach of the United States Supreme Court to consent searches.* The starting point in the modern federal law of consent to search is *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973). In *Schneckloth*, the defendant was stopped by Officer James Rand who observed that one headlight and the license plate light were burned out on the vehicle. *Schneckloth*, 412 U.S. at 220, 93 S. Ct. at 2044, 36 L. Ed. 2d at 858. Rand requested the six occupants to step out of the car. *Id.* After the occupants complied, two additional police officers arrived. *Id.* Rand then asked an occupant, who was the car owner's brother, if he could search the car. *Id.* The occupant responded, "Sure, go ahead." *Id.* While searching the car, the police found three checks that had been stolen from a carwash wadded up under the left rear seat. *Id.* at 220, 93 S. Ct. at 2044, 36 L. Ed. 2d at 859. The defendant was charged with possessing a check with intent to defraud. *Id.* at 219, 93 S. Ct. at 2044, 36 L. Ed. 2d at 858. In determining whether the consent search was valid, the *Schneckloth* Court considered whether consent in a search required a knowing and voluntary waiver of constitutional rights such as that required in *Johnson v. Zerbst*, 304 U.S. 458, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938), which held that a waiver of the right to counsel in a federal trial was invalid unless the high standard of waiver was met. *Id.* at 235, 93 S. Ct. at 2051–52, 36 L. Ed. 2d at 867.

The Supreme Court in *Schneckloth* concluded that the knowing and voluntary waiver standards of *Zerbst* did not apply in determining

the validity of a consent search. *Id.* at 235–46, 93 S. Ct. at 2051–58, 36 L. Ed. 2d at 867–74. The *Schneckloth* Court contrasted the right in *Zerbst*, which impacted a right designed to guarantee a fair trial and the reliability of the truth-determining process, with the right involved under the Fourth Amendment. *Id.*

Instead of requiring a *Zerbst*-type waiver, the Supreme Court held that the standard for determining the validity of a consent to search is whether the consent was voluntarily given and not a result of duress or coercion, expressed or implied. *Id.* at 247–48, 93 S. Ct. at 2058–59, 36 L. Ed. 2d at 874–75. Voluntariness is a question of fact to be determined by all the circumstances. *Id.* at 248–49, 93 S. Ct. at 2059, 36 L. Ed. 2d at 875. "[W]hile the subject's knowledge of a right to refuse is a factor to be taken into account," it is not a prerequisite for obtaining voluntary consent. *Id.* at 249, 93 S. Ct. at 2059, 36 L. Ed. 2d at 875.

The *Schneckloth* majority reasoned that a search authorized by consent may be the only means of obtaining important and reliable evidence. *Id.* at 227–28, 93 S. Ct. at 2048, 36 L. Ed. 2d at 863. Further, the majority stated that requiring a *Miranda*-type waiver in Fourth Amendment cases would be "thoroughly impractical." *Id.* at 231–32, 93 S. Ct. at 2049–50, 36 L. Ed. 2d at 865–66.

Justice Marshall dissented in *Schneckloth.* Justice Marshall challenged the majority view that a suspect may relinquish a constitutional right without knowing that he or she may refuse to accede to the police request. *Id.* at 284–90, 93 S. Ct. at 2077–80, 36 L. Ed. 2d at 895–99 (Marshall, J., dissenting). The issue, according to Justice Marshall, was not whether the consent was "coerced," but whether a citizen has chosen to exercise or forgo constitutional rights. *Id.* at 282–83, 93 S. Ct. at 2076, 36 L. Ed. 2d at 894–95.

The Supreme Court considered the application of *Schneckloth* in the context of a traffic stop in *Ohio v. Robinette*, 519 U.S. 33, 117 S. Ct. 417, 136 L. Ed. 2d 347 (1996). In *Robinette*, a motorist was stopped as a result of a speeding violation. *Robinette*, 519 U.S. at 35, 117 S. Ct. at 419, 136 L. Ed. 2d at 352. The officer obtained Robinette's driver's license and determined, as a result of a computer check, that Robinette had no previous violations. *Id.* He then asked Robinette to step out of the car, issued a verbal warning, and returned the driver's license. *Id.* At this point, the officer turned on his video camera and asked Robinette, "One question before you get gone: [A]re you carrying any illegal contraband in your car? Any weapons of any kind, drugs, anything like that?" *Id.* at 35–36, 117 S. Ct. at 419, 136 L. Ed. 2d at 352 (internal quotation marks omitted). After receiving a negative response, the officer asked for permission to search the car. *Id.* at 36, 117 S. Ct. at 419, 136 L. Ed. 2d at 352. After Robinette consented, drugs were found pursuant to the search. *Id.*

Robinette challenged the search on the ground that his consent was not voluntary under *Schneckloth*. *Id.* at 35, 117 S. Ct. at 419, 136 L. Ed. 2d at 352. The Ohio Supreme Court ruled that the search was invalid, holding that when a suspect is stopped for a traffic offense, he or she must be informed that they are free to go before an officer may engage in a consensual interrogation. *Id.* at 36, 117 S. Ct. at 419–20, 136 L. Ed. 2d at 353.

The United States Supreme Court reversed. The majority of the Court held that there was no "per se" rule for voluntariness in the setting of a traffic stop and remanded the case to the Ohio Supreme Court for further proceedings. *Robinette*, 519 U.S. at 39–40, 117 S. Ct. at 421, 136 L. Ed. 2d at 354–55.

The majority opinion in *Robinette* drew two separate opinions. Justice Ginsburg concurred, but noted that the Ohio Supreme Court was free to establish a per se rule determining the voluntariness of consent searches in automobile stops on state constitutional grounds. *Id.* at 40–45, 117 S. Ct. at 422–24, 136 L. Ed. 2d at 355–58 (Ginsburg, J., concurring). Justice Stevens dissented, explaining that he would affirm the judgment of the Ohio Supreme Court because the officers obtained the consent during an illegal detention. *Id.* at 51, 117 S. Ct. at 427, 136 L. Ed. 2d at 362 (Stevens, J., dissenting). Further, Justice Stevens agreed with Justice Ginsburg that the Ohio Supreme Court could require officers to inform suspects that they are free to go before engaging in consensual interrogation under the Ohio Constitution. *Id.* at 51–52, 117 S. Ct. at 427–28, 136 L. Ed. 2d at 362–63.

To some extent, the views of both Justice Stevens and Justice Ginsburg were vindicated when the case was remanded to the Ohio Supreme Court. On remand, the Ohio Supreme Court again found that the consent to search was involuntary. *State v. Robinette (Robinette III)*, 685 N.E.2d 762, 771 (Ohio 1997). The Ohio Supreme Court emphasized that it did not adopt a per se requirement that all motorists must be informed of their right to leave, but held under the totality of the circumstances in the case before it that the consent was invalid. *Id.* Further, the Ohio Supreme Court clarified that its holding was based upon the search and seizure provisions of the Ohio Constitution. *Id.*

2. *Independent state constitutional approaches to voluntariness of consent searches.* There is no question that state courts, as noted by Justice Ginsburg in *Robinette*, are free to develop their own search and seizure law under their state constitutions. *See Ochoa*, 792 N.W.2d at

267.  This principle has been vividly illustrated in the aftermath of *Schneckloth.*

A number of state supreme courts have followed *Schneckloth* in deciding cases under their state constitutions.  Many of these states, unlike Iowa, have adopted a lockstep approach whereby the constitutional decisions of the United States Supreme Court are deemed authoritative on matters of state constitutional law under similar constitutional provisions.  *See, e.g., Scott v. State*, 782 A.2d 862, 876–77 (Md. 2001); *State v. Osborne*, 402 A.2d 493, 497 (N.H. 1979); *Commonwealth v. Cleckley*, 738 A.2d 427, 433 (Pa. 1999); *State v. Cox*, 171 S.W.3d 174, 183–84 (Tenn. 2005); *State v. Rodgers*, 349 N.W.2d 453, 459 (Wis. 1984).

Several states, however, have rejected the *Schneckloth* approach and required that, in order for a search or seizure to be valid based on consent, the subject must provide a knowing and voluntary waiver under *Zerbst.  See, e.g., State v. Brown*, 156 S.W.3d 722, 731–32 (Ark. 2004) (concluding that officers performing knock-and-talk procedure must inform the subject of his or her right to refuse consent to the search); *Penick v. State*, 440 So. 2d 547, 551 (Miss. 1983) (holding the voluntariness requirement requires a showing that the defendant knew of his or her right to refuse); *State v. Johnson*, 346 A.2d 66, 68 (N.J. 1975) (holding individual must have knowledge of right to refuse consent in order for consent to be deemed voluntary); *State v. Ferrier*, 960 P.2d 927, 932–33 (Wash. 1998) (stating that, under state constitution, knock-and-talk procedure to acquire consent requires officers to inform the subject of his or her right to refuse consent).

Other states have not required a knowing and voluntary waiver, but have employed a *Schneckloth*-type "totality of the circumstances" test

in a fashion more demanding than the United States Supreme Court. In *Robinette III*, for instance, the Ohio Supreme Court, by expressly stating that its *Schneckloth*-type analysis was based on state constitutional grounds, impliedly recognized that the United States Supreme Court could well have been less demanding in its application of the *Schneckloth* test. *See Robinette III*, 685 N.E.2d at 771–72. Such a relatively demanding approach to evaluating the "totality of the circumstances" might be characterized as *Schneckloth* "with teeth" test. *See also State v. Nemeti*, 472 N.W.2d 477, 478 (S.D. 1991) (requiring the state to establish voluntariness "by clear and convincing evidence that the search was the result of a free, intelligent, unequivocal and specific consent without any duress or coercion, actual or implied").

3. *Iowa case law on consent searches.* We have confronted the issue of voluntary consent in many search and seizure cases. We have not generally explored whether the court should adopt the Supreme Court's *Schneckloth* standard under article I, section 8 of the Iowa Constitution or whether we should follow an independent path. In nearly all of our search and seizure cases involving consent, it appears that either the parties did not raise state constitutional claims, or if they did, they did not suggest that article I, section 8 of the Iowa Constitution should be given a different interpretation than the federal counterpart. *See Lane*, 726 N.W.2d at 378–80 (holding that defendant's girlfriend consented to search, but no mention of claim under Iowa Constitution); *see also State v. Reinier*, 628 N.W.2d 460, 467–69 (Iowa 2001) (holding that state failed to establish voluntary consent in the context of a "knock and talk" under the Fourth Amendment and article I, section 8 of the Iowa Constitution without an independent discussion of the Iowa Constitution); *State v. Horton,* 625 N.W.2d 362, 364 (Iowa 2001) (stating

that search was not supported by consent under *Schneckloth* without discussing state constitution); *State v. Manna,* 534 N.W.2d 642, 643–44 (Iowa 1995) (discussing only the Fourth Amendment in determining whether the consent was voluntary); *State v. Oakley*, 469 N.W.2d 681, 683 (Iowa 1991) (same); *State v. Myer*, 441 N.W.2d 762, 765–66 (Iowa 1989) (same); *State v. Folkens*, 281 N.W.2d 1, 3–4 (Iowa 1979) (same); *State v. Ege*, 274 N.W.2d 350, 353 (Iowa 1979) (discussing *Schneckloth* without reference to article I, section 8); *State v. Jones*, 274 N.W.2d 273, 275–76 (Iowa 1979) (mentioning in passing article I, section 8 and citing, without analysis, *Schneckloth* for the proposition that valid consent is an exception to the warrant requirement); *State v. Carter*, 267 N.W.2d 385, 385 (Iowa 1978) (stating sole issue was constitutionality of consent search under Fourth Amendment); *State v. Bakker*, 262 N.W.2d 538, 546–47 (Iowa 1978) (discussing consent in context of Fourth Amendment only); *Bettuo v. Pelton*, 260 N.W.2d 423, 425–27 (Iowa 1977) (same); *State v. Ahern*, 227 N.W.2d 164, 165–67 (Iowa 1975) (mentioning only Fourth Amendment in applying *Schneckloth*).

In *Reinders*, however, we did consider claims brought under both the Fourth Amendment and article I, section 8 of the Iowa Constitution in a search and seizure case involving consent. *Reinders*, 690 N.W.2d at 81. The accused in *Reinders* was approached by police in a K-Mart parking lot. *Id.* at 80. After asking the accused about his activities and requesting identification, police asked for consent to search. *Id.* The court found the consent valid, noting that there was "no show of authority, no intimidation, and no use of physical force . . . . The officers simply engaged him in conversation and asked for identification." *Id.* at 83. While the opinion states that the court found "no basis to distinguish the protections afforded by the Iowa Constitution," it is not

clear from the opinion precisely what distinctive arguments, if any, were raised on appeal. *See id.* at 82.

We have also considered the validity of consent in search and seizure cases involving automobiles. In *State v. Smith*, 217 N.W.2d 633, 634 (Iowa 1974), we were asked if a consent was voluntary during a traffic stop. In *Smith*, the defendant alighted from his car and approached the officers after being pulled over. *Smith*, 217 N.W.2d at 634. After reviewing the defendant's driver's license, an officer asked if the officers could search the car. *Id.* The search was found voluntary under *Schneckloth*. *Id.* at 635. Further, in a case prior to *Schneckloth*, we held that a consent to search during a vehicle stop was voluntary under the Fourth Amendment after the driver was asked to step out of the car even though the officer had drawn his gun when approaching the vehicle as a precaution in light of reports of an armed suspect. *State v. Baych*, 169 N.W.2d 578, 583 (Iowa 1969), *overruled on other grounds by State v. Erickson*, 362 N.W.2d 528, 530 (Iowa 1985).

4. *Academic commentary on consent searches pursuant to traffic stops.* The academic commentary on *Schneckloth* has been generally unfavorable and has attacked the basic premises of the decision as applied in a traffic stop case. A number of commentators simply seem to side with Justice Marshall's dissent, noting the irony in finding a "voluntary consent" even when the individual does not realize that he or she has a right to refuse. *See* Arnold H. Loewy, *Knowing "Consent" Means "Knowing Consent": The Underappreciated Wisdom of Justice Marshall's* Schneckloth v. Bustamonte *Dissent*, 79 Miss. L.J. 97, 104–08 (2009).

Many of the academic commentators, however, also attack the lack of stringent application of the *Schneckloth* test in the context of a traffic

stop.  *See, e.g.*, Morgan Cloud, *Ignorance and Democracy*, 39 Tex. Tech L. Rev. 1143, 1160–61 (2007) (criticizing the Supreme Court's application of *Schneckloth* in *Florida v. Jimeno*, 500 U.S. 248, 111 S. Ct. 1801, 114 L. Ed. 2d 297 (1991)); Eamon Kelly, *Race, Cars and Consent: Reevaluating No-Suspicion Consent Searches*, 2 DePaul J. for Soc. Just. 253, 258 (2009) (noting the broad discretion given to officers to utilize consent searches after *Schneckloth*); Tracey Maclin, *The Good and Bad News About Consent Searches in the Supreme Court*, 39 McGeorge L. Rev. 27, 57 (2008) (observing that post-*Schneckloth* decisions have "transformed [*Schneckloth*] from its self-described narrow, fact-specific holding to a ruling that adopts a presumption of valid consent whenever the police ask for consent and there is assent").  Commentators have also criticized the "totality of the circumstances" test of *Schneckloth* as lacking in predictability.  For instance, Professor LaFave has noted that the voluntariness issue under the Fifth Amendment proved so problematic that *Miranda* warnings were required.  4 Wayne R. LaFave, *Search and Seizure:  A Treatise on the Fourth Amendment* § 8.2, at 51 (4th ed. 2004). Professor LaFave sees the same problem in the context of the Fourth Amendment in light of "the inherent ambiguity" of the *Schneckloth* test. *Id.* at 54; *see also* Marcy Strauss, *Reconstructing Consent*, 92 J. Crim. L. & Criminology 211, 220–21 (2002) [hereinafter Strauss] (characterizing the *Schneckloth* test as vague and providing little guidance to courts).

Commentators have repeatedly noted that a traffic stop gives rise to an element of compulsion.  *See, e.g.*, Strauss, 92 J. Crim. L. & Criminology at 219 n.29 (noting motorists are often asked for consent under "unfamiliar and intimidating" circumstances); Peter M. Tiersma & Lawrence M. Solan, *Cops and Robbers: Selective Literalism in American Criminal Law*, 38 Law & Soc'y Rev. 229, 243 (2004) [hereinafter Tiersma]

(stating a request to search may be interpreted as an order to comply due to the "inherently coercive nature of a traffic stop"); Robert H. Whorf, *Consent Searches Following Routine Traffic Stops: The Troubled Jurisprudence of a Doomed Drug Interdiction Technique*, 28 Ohio N.U. L. Rev. 1, 22 n.121 (2001) [hereinafter Whorf] (citing the "overall coercive nature of the routine traffic stop" as a plausible explanation for the acquiescence to search); Erica Flores, Comment, *"People, Not Places": The Fiction of Consent, The Force of the Public Interest, and the Fallacy of Objectivity in Police Encounters with Passengers During Traffic Stops*, 7 U. Pa. J. Const. L. 1071, 1081 (2005) [hereinafter Flores] (observing that a traffic stop creates "an inherently coercive environment"); Carla R. Kock, Note, State v. Akuba*: A Missed Opportunity to Curb Vehicle Searches of Innocent Motorists on South Dakota Highways*, 51 S.D. L. Rev. 152, 182 (2006) [hereinafter Kock] ("[T]he reality of traffic stops as state-sponsored exercises of power that contain inherently coercive elements deserves attention from the courts.").

In addition, commentators have challenged the assumption of *Schneckloth* that providing a knowledge requirement could jeopardize the continued viability of consent searches. One study, after examining consent searches in Ohio, concludes that advising a motorist that he or she is free to leave or that the motorist was free to refuse to allow the search would not have a significant impact on the number of consent searches. Illya Lichtenberg, Miranda *in Ohio: The Effects of* Robinette *on "Voluntary" Waiver of Fourth Amendment Rights*, 44 How. L.J. 349, 370–71 (2001); *see also* Steven L. Chanenson, *Get the Facts, Jack! Empirical Research and the Changing Constitutional Landscape of Consent Searches*, 71 Tenn. L. Rev. 399, 465–66 (2004); Matthew Phillips,

*Effective Warnings Before Consent Searches: Practical, Necessary, and Desirable*, 45 Am. Crim. L. Rev. 1185, 1201 (2008) [hereinafter Phillips].

Further, academic commentators also question whether giving appropriate warnings would be an unreasonable burden on law enforcement. While *Schneckloth* declares that such a requirement would be "thoroughly impractical," *Schneckloth*, 412 U.S. at 231, 93 S. Ct. at 2050, 36 L. Ed. 2d at 865–66, this assertion does not seem to be true. Indeed, police in New Jersey have been required to give such warnings in any routine traffic stop prior to seeking consent to search. *See* Phillips, 45 Am. Crim. L. Rev. at 1197–1206; *see also* James A. Adams, *Search and Seizure as Seen by Supreme Court Justices: Are They Serious or Is This Just Judicial Humor*, 12 St. Louis U. Pub. L. Rev. 413, 446–47 (1993); Eugene E. Smary, Note, *The Doctrine of Waiver and Consent Searches*, 49 Notre Dame L. Rev. 891, 903 (1974).

5. *Determination of validity of consent searches under article I, section 8 in this case.* In this case, we need not decide whether a knowing or intelligent waiver of search and seizure rights, such as that adopted in New Jersey, Washington, Mississippi, or Arkansas, is required to establish consent under article I, section 8 of the Iowa Constitution. An evaluation of such a per se requirement that police advise an individual of his or her right to decline to consent to a search, as is urged by LaFave and others, is reserved for another day.

Instead, we decide the case on a narrower ground. We hold, even if we apply an Iowa version of the *Schneckloth*-type "totality of the circumstances" test, the consent cannot be considered voluntary in this case under article I, section 8 of the Iowa Constitution.[10] Our analysis in

---

[10]Our holding is not based upon the Fourth Amendment of the United States Constitution, but on the independent grounds provided by article I, section 8 of the Iowa Constitution.

this case is similar to that of the Ohio Supreme Court when it addressed the consent issue on remand from the United States Supreme Court in *Robinette III*.

First, we note that Wubben subjected Pals to a pat-down search, which included a command to empty Pals' pockets, before detaining Pals in the police cruiser. There is nothing in the record to suggest that Wubben detected danger from Pals, who was stopped over a civil infraction. The pat-down search, however, projected authority over Pals and is a factor to be considered in determining the voluntariness of the search.

Second, we note that Pals was detained in the police vehicle at the time of the consent to search. We are thus not faced with a voluntary encounter in a public area, *Reinders*, 690 N.W.2d at 80, or an encounter on the familiar surroundings of the threshold of one's home. Instead, Pals found himself seized in the front seat of a squad car with his own vehicle parked on the side of a public highway. *See United States v. Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 1877, 64 L. Ed. 2d 497, 509 (1980) (stating that a person is "seized" within the meaning of the Fourth Amendment when, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave"). While the fact that a person is seized is not necessarily determinative under a totality of the circumstances test, *Ahern*, 227 N.W.2d at 166, we agree with the cases and commentators that view the setting of a traffic stop on a public road as inherently coercive. *See Brown*, 182 P.3d at 626 (stating motorists who have been stopped for a traffic violation do not act from a position of psychological independence); *Robinette III*, 685 N.E.2d at 771 (citing impliedly coercive nature of traffic stop); Strauss, 92 J. Crim. L. & Criminology at 219 n.29;

Tiersma, 38 Law & Soc'y Rev. at 243; Whorf, 28 Ohio N.U. L. Rev. at 7 (citing coercion inherent in consent searches after routine traffic stops); Flores, 7 U. Pa. J. Const. L. at 1095; Kock, 51 S.D. L. Rev. at 182. In this setting, police plainly have the upper hand and are exerting authority in a fashion that makes it likely that a citizen would not feel free to decline to give consent for a search even though the search is unrelated to the rationale of the original stop.

Third, we note that Pals was never advised that he was free to leave or that he could voluntarily refuse consent without any retaliation by police. Under the *Schneckloth*-type approach, such a warning is not always required. Nonetheless, it still is an important factor in determining whether a consent to search is truly voluntary. The lack of any statement that Pals was free to leave or that he could decline to give his consent to the search in this case is, at a minimum, a strong factor cutting against the voluntariness of the search, particularly in the context of a traffic stop where the individual is seized in the front seat of a police car. *See Brown*, 182 P.3d at 634 (citing lack of statements that individual was free to leave or to decline consent to search as factors to find consent involuntary in traffic stop case). A warning of rights would serve to significantly neutralize the coercive setting in this case.

Fourth, Wubben had not advised Pals that he had concluded business related to the stop at the time he asked for consent. By not advising Pals that the business relating to the stop was concluded, Wubben conveyed the impression that Pals might receive more favorable treatment if he consented to the search. The lack of closure of the original purpose of the stop makes the request for consent more threatening. *See id.* at 631 (noting motorists have a "strong interest in catering to the officer's wishes until the officer announces [his or her]

decision whether to issue a citation or only a warning"); *Carty*, 790 A.2d at 908–09 (same); *see also* George E. Dix, *Waiver in Criminal Procedure: A Brief for More Careful Analysis*, 55 Tex. L. Rev. 193, 251–60 (1977) (citing anticipation of unfavorable exercise of official discretion as a factor in consent-to-search cases). If Wubben had advised Pals that he was free to go, the stop would have become a less coercive voluntary encounter.

In light of these factors, we conclude that the consent was not voluntary under article I, section 8 of the Iowa Constitution. To conclude otherwise would require us to give too much weight to words spoken by an individual and ignore the surrounding conditions strongly pointing to involuntariness of the consent.

The record in this case further demonstrates that there was no break between the illegal action and the evidence subsequently obtained. As a result, there is no attenuation of the taint sufficient to avoid exclusion of the evidence obtained as a result of the unlawful search. *Lane*, 726 N.W.2d at 380–81; *Reinier*, 628 N.W.2d at 467 n.3.

**V. Conclusion.**

For the above reasons, we conclude that the district court erred by refusing to grant Pals' suppression motion. As a result, the judgment of the district court is reversed and the case remanded to the district court for further proceedings.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**

All justices concur except Waterman, J., who dissents, and Mansfield, J., who takes no part.

**WATERMAN, Justice (dissenting).**

I respectfully dissent, both to voice my disagreement with the majority's fact-specific outcome in this case and, more broadly, to protest my brethren's divergence from our own precedent and well-settled federal constitutional precedent. I would affirm the district court decision and Judge Mansfield's well-reasoned majority opinion of our court of appeals that correctly held Pals voluntarily consented to the search of his truck during a fairly benign encounter with Deputy Wubben. The deputy did not violate Pals' constitutional rights by asking for permission to search his truck after a legitimate traffic stop. The validity of this consent search is solidly grounded on Fourth Amendment search and seizure caselaw, and there is no good reason to hold otherwise under article I, section 8 of the Iowa Constitution.

**I. Pals Waived Any Claim the Iowa Constitution Provides Broader Protection Against Searches and Seizures Than the Fourth Amendment.**

Today's divergence from federal authorities was not advocated by any party until our court requested supplemental briefing this year. Although Pals' appellate brief raised both the federal and Iowa constitutional search and seizure provisions, he never argued our state constitution provided broader protection. To the contrary, he merely stated:

> The search and seizure clause of the Iowa Constitution is substantially identical in language to the Fourth Amendment. *See* Iowa Const. art. I, § 8. The Court consistently interprets the scope and purpose of article I, section 8 of the Iowa Constitution to be the same as federal interpretations of the Fourth Amendment. *Breuer,* 577 N.W.2d at 44.

The State's appellate brief did not mention article I, section 8 nor did Pals' application for further review. Thus, the majority proceeded with its independent analysis under the Iowa Constitution without the urging of any party. The majority thereby altered our practice of using only the federal analysis in addressing constitutional issues when neither party had argued the Iowa Constitution requires a different approach. *See, e.g., Reilly v. Iowa Dist. Ct.*, 783 N.W.2d 490, 494 (Iowa 2010) ("Because Reilly has not advanced a standard for interpreting the due process clause under the Iowa Constitution different from its federal constitutional counterpart, we will apply the general principles as outlined by the United States Supreme Court."); *State v. Bruegger*, 773 N.W.2d 862, 883 (Iowa 2009) (applying Federal Eighth Amendment framework because defendant "has not advanced a standard for interpreting the cruel and unusual punishment provision under the Iowa Constitution differently"); *In re Det. of Garren*, 620 N.W.2d 275, 280 n.1 (Iowa 2000) (refusing to deviate from federal analysis in considering state constitutional claim because appellant "ha[d] suggested no legal deficiency in the federal principles . . . nor ha[d] he offered an alternative test or guidelines").

"Our obligation on appeal is to decide the case within the framework of the issues raised by the parties." *Feld v. Borkowski*, 790 N.W.2d 72, 78 (Iowa 2010). We should "do no more and no less." *Id.* The majority in this case unnecessarily overturns existing law sua sponte. In so doing, the majority violates the admonition so recently reiterated in *Feld*:

> [I]n the absence of the most cogent circumstances, we do not create issues or unnecessarily overturn existing law sua sponte when the parties have not advocated for such a change. In this case, we are restrained to apply the

controlling law as advocated by the parties, and we do not consider or forecast whether or not that controlling law should be abandoned or changed . . . .

*Id.* at 78 n.4 (citations omitted). The restraint exercised by our court in *Feld* should have been employed here.

Accordingly, our court should have found Pals waived any claim of greater protection under article I, section 8 when he failed to brief and argue that proposition and, instead, stated both provisions are "consistently interpret[ed] . . . to be the same." *See* Iowa R. App. P. 6.903(2)(g)(3) ("Failure to cite authority in support of an issue may be deemed waiver of that issue."); *see also State v. Jewett*, 500 A.2d 233, 234 (Vt. 1985) (declining to reach state constitutional search and seizure question raised by the parties because "neither party has presented any substantive analysis or argument").

## II. Pals Voluntarily Consented to the Search.

The majority correctly concludes that Wubben's initial stop of Pals was lawful based on probable cause of an ongoing civil infraction—dogs at large. Appellate de novo review of the encounter is facilitated by the DVD recording from the patrol car's dash camera. Judge Mansfield's decision accurately describes Wubben's interactions with Pals leading up to the consent search:

> At about 2:00 p.m. Wubben returned on foot to Pals's vehicle and asked Pals for his proof of insurance. Approximately three minutes elapsed as Pals looked unsuccessfully for his insurance card. At that point, Wubben asked Pals to step into the front of his patrol car. In a cordial way, he asked Pals if he could pat him down for weapons before he got into the car.
>
> At approximately 2:05 p.m., Wubben and Pals entered the front of the patrol car. Once in the car, Wubben and Pals discussed where Pals currently resided and the need for Pals to change the address on his driver's license. For most of the next five minutes or so, the pair engaged in friendly chatter about where Pals worked, golf, the rainy weather, a

washed-out golf tournament, and Pals's activities of that day and plans to go to a casino. Most of this friendly conversation was initiated by Pals. The need for rabies tags was also discussed. During that time, Wubben apparently prepared some kind of paperwork regarding the failure to have proof of insurance, while assuring Pals that he could call in his insurance information to the sheriff's office and avoid fifty dollars in court costs. At around 2:11 p.m., Wubben casually asked Pals if he could look in his vehicle, and Pals consented. Both got out of the patrol car and went to the truck.

At 2:12 p.m., Pals opened the driver's door for Wubben. Pals was asked to step in front of the truck, and he complied. After less than two minutes of searching the passenger compartment of the truck, Wubben said, "Oh man." Pals responded, "What have you got?" Wubben replied, "Green stuff." . . . In total, a half gram of marijuana was retrieved from the truck. Pals denied the marijuana was his and denied knowing it was in the truck. Pals then assisted Wubben's continuation of the search by opening the passenger door of the truck and pulling the seat forward.

The State proved Pals' consent was voluntary under the totality of the circumstances. *See State v. Lane*, 726 N.W.2d 371, 378 (Iowa 2007). These factors include

"*personal characteristics* of the [consenter], such as age, education, intelligence, sobriety, and experience with the law; and features of the context in which the consent was given, such as the length of detention or questioning, the substance of any discussion between the [consenter] and police preceding the consent, whether the [consenter] was free to leave or was subject to restraint, and whether the [consenter's] contemporaneous reaction to the search was consistent with consent."

*Id.* (quoting *United States v. Va Lerie*, 424 F.3d 694, 709 (8th Cir. 2005) (emphasis added) (citation omitted)). Pals was forty-six years old with a high school education. He was sober and had no difficulties communicating with Wubben. The twenty-minute traffic stop was not so long as to result in duress. Pals' behavior was consistent with consent, including that he opened the vehicle doors and pulled the seat forward for Wubben. I agree with the court of appeals' summary of the fairly

benign interaction between Wubben and Pals leading up to the search of his vehicle:

> Although Pals was subjected to a pat-down search and was in the police car when consent was given, the circumstances as a whole leave no doubt that his consent was voluntary. The encounter between Pals and Wubben was relatively brief and cordial. The two engaged in very amicable discussion, with most of the conversation being initiated by Pals. Pals sat in the front seat of the police car and was not in handcuffs. Wubben's request for consent was completely devoid of any coercion, undue pressure, or threats. After providing consent, Pals opened the driver's side door for Wubben. Accordingly, we conclude Pals's consent was voluntary.

I would hold Pals' consent was voluntary under both the Fourth Amendment and article I, section 8 of the Iowa Constitution. The framers of the Iowa Constitution chose to use virtually identical language to duplicate the same constitutional protection against unreasonable searches and seizures as the Fourth Amendment. *State v. Nelson,* 231 Iowa 177, 185, 300 N.W. 685, 689 (1941) (Mitchell, J., dissenting) (article I, section 8 was the Fourth Amendment "reenacted" in Iowa to apply to the state). Accordingly, we have long given these counterpart provisions the same meaning; *see also State v. Breuer,* 577 N.W.2d 41, 44 (Iowa 1998) (" '[T]he language of those clauses is substantially identical and we have consistently interpreted the scope and purpose of article I, section 8, of the Iowa Constitution to track with federal interpretations of the Fourth Amendment.' " (quoting *State v. Showalter*, 427 N.W.2d 166, 168 (Iowa 1988))). Federal authorities are therefore persuasive in construing our Iowa Constitution. *See generally People v. Caballes,* 851 N.E.2d 26, 45 (Ill. 2006) (reaffirming "limited lockstep" approach to construe search and seizure provision of Illinois Constitution consistent with federal case law); Robert F. Williams, *The Law of American State Constitutions* 194

(2009) (The "clear majority" of "state courts decide to *follow*, rather than *diverge from*, federal constitutional doctrine.").

The majority incorrectly holds Pals' consent under these circumstances cannot be considered voluntary under article I, section 8 of the Iowa Constitution for four reasons. First, Wubben gave Pals a pat-down search and had Pals empty his pockets. The majority cites no authority holding a pat-down search of the driver renders his consent to search his vehicle involuntary. Courts have repeatedly held persons subject to pat-down searches nevertheless voluntarily consented to searches of their homes or vehicles. *See, e.g., United States v. Pedroza*, 269 F.3d 821, 827 (7th Cir. 2001) ("[E]ven assuming that the pat-down search was illegal . . . there was ample evidence that [the suspect's] consent to the search of his home and his [vehicle] resulted from an independent act of free will and not from any exploitation of the questionable pat-down search."); *United States v. Zubia-Melendez*, 263 F.3d 1155, 1163 (10th Cir. 2001) (holding suspect's consent to police vehicle search voluntary despite prior frisk); *United States v. Kikumura*, 918 F.2d 1084, 1093 (3d Cir. 1990) (finding suspect voluntarily consented to a search of his glove compartment despite prior pat-down search), *overruled on other grounds by United States v. Grier*, 449 F.3d 558, 570 (3d Cir. 2006).

Second, the majority relies on the fact Pals gave his consent while seated in the front seat of the squad car. The majority views this setting as "inherently coercive," relying on several commentators and the decisions of just two other state appellate courts representing a minority view. I disagree that sitting in the front seat of the squad car coerced Pals. As Judge Mansfield noted, "This factor alone is not sufficient, however; otherwise, any consent given by a person in detention would be

invalid." The Supreme Court has made clear that even arrest does not thwart what otherwise appears to be a valid subsequent consent. *United States v. Watson*, 423 U.S. 411, 425, 96 S. Ct. 820, 828, 46 L. Ed. 2d 598, 609–10 (1976) ("[T]o hold that illegal coercion is made out from the fact of arrest and the failure to inform the arrestee that he could withhold consent would not be consistent with *Schneckloth* and would distort the voluntariness standard that we reaffirmed in that case."). Our court likewise held that a defendant who is incarcerated may voluntarily consent to a search of his vehicle. *State v. Gates*, 260 Iowa 772, 775–77, 150 N.W.2d 617, 619–20 (1967). If someone in jail can voluntarily consent to a search of his car, so too can a citizen seated in a squad car.

Placing a suspect on the back seat, where the car doors cannot be opened from the inside, treats him like a prisoner. The front seat, where Pals sat talking with Wubbens, is much less threatening. Citizens pulled over for speeding or other traffic offenses routinely find themselves in the front seat of a squad car. Wubben confronted Pals with fairly innocuous infractions—violation of an ordinance prohibiting dogs at large and failure to produce proof of insurance. They amicably talked through the resolution of those matters. The video shows no intimidation. The district court, upon viewing the DVD and hearing Wubben's testimony in person, found Pals' consent to be voluntary. We give deference to the district court's credibility determination finding Pals' consent was voluntary. *State v. Turner*, 630 N.W.2d 601, 606 (Iowa 2001). The court of appeals majority, viewing the same DVD, and Judge Doyle's dissent all agreed that "Wubben's request for consent to search the truck was completely devoid of any coercion, undue pressure, or threats, and that Pals's consent was voluntary." In *State v. Reinders*, three policemen arriving in two squad cars accosted a pedestrian late at night under

circumstances notably more coercive than Pals' amiable daytime chat with Wubben, yet this court unanimously found the consent search valid under *both* the Fourth Amendment and article I, section 8 of the Iowa Constitution. 690 N.W.2d 78, 82–84 (Iowa 2004). Today's holding cannot be reconciled with *Reinders.* We should follow our own precedent, not a minority view expressed by courts in other states.

Third, the majority relies on the fact Wubben did not advise Pals he could say no and go. Controlling federal authority does not require such statements. *See, e.g., United States v. Drayton,* 536 U.S. 194, 207, 122 S. Ct. 2105, 2113, 153 L. Ed. 2d 242, 255 (2002) ("[A] presumption of invalidity [does not] attach[] if a citizen consented [to a search] without explicit notification that he or she was free to refuse to cooperate. Instead, . . . the totality of the circumstances must control, without giving extra weight to the absence of this type of warning."); 4 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 8.2(i), at 110–11 (4th ed. 2004) ("[V]alid consent may be established without a showing that the police advised the consenting party of his Fourth Amendment rights or that this party was otherwise aware of those rights."). Our own precedent does not require police to advise persons they can say no to a request to search. *Reinders,* 690 N.W.2d at 82 ("An individual's response [to police questioning and requests to search] is considered consensual, even though the person has not been advised that he is free to refuse to respond."). Further, Wubben asked to search in a casual way: "Say you don't have anything, any weapons or drugs or anything like that in your vehicle, do you? Do you care if I take a look?" Because Wubben phrased this as a question rather than a command, Pals should have understood he could say no.

Today the majority acknowledges the *Schneckloth v. Bustamonte* Court concluded it would be "thoroughly impractical," 412 U.S. 218, 227–31, 93 S. Ct. 2041, 2048–50, 36 L. Ed. 2d 854, 863 (1973), to require *Miranda*-type warnings for traffic-stop consent searches. Indeed, the United States Supreme Court recently reiterated that "*Miranda* is to be enforced 'only in those types of situations in which the concerns that powered the decision are implicated.' Thus, the temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop does not constitute *Miranda* custody.'" *Maryland v. Shatzer*, 599 U.S. ___, ___, 130 S. Ct. 1213, 1224, 175 L. Ed. 2d 1045, 1058 (2010) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 437, 104 S. Ct. 3138, 3148–49, 82 L. Ed. 2d 317, 333 (1984)) (other citation omitted). There is no valid reason to break from this precedent.

The majority "reserve[s] for another day" the question whether to impose a "per se requirement that police advise an individual of his or her right to decline to consent to a search." Yet, as a practical matter, by holding Pals' consent involuntary under the record in this case, the majority today effectively invalidates any consent search following a pat down or detention unless the suspect was first told he can say no and go.

Our elected legislature, in its wisdom, can impose by statute a requirement that police tell drivers they have a right to say no and go when asked for permission to search the vehicle. I do not believe we should construe our state constitution to impose such a requirement lacking in our prior precedent and settled Federal Fourth Amendment caselaw.

Finally, the majority finds the "lack of closure of the original purpose of this stop makes the request for consent more threatening." I disagree. Pals and Wubben had already talked through resolutions of

the dog and insurance matters. Even if their discussion fell short of "closure," Wubben made no suggestion of harsher treatment on those minor infractions if Pals refused permission to search.

Consent searches are an important law enforcement tool. Police, with some regularity, capture large quantities of narcotics after the driver gives permission to search his vehicle. Common sense dictates that persons traveling with contraband are more likely to refuse permission to search if told they have the right to do so. I would not handicap our police by imposing a de facto requirement to give such a warning during pedestrian *Terry* stops or routine traffic stops.

Pals' consent would be found voluntary under our court's precedent and under the applicable Fourth Amendment decisions of the United States Supreme Court. I would honor stare decisis and apply that precedent here to promote the predictability, legitimacy, and stability of our state law. *See Kiesau v. Bantz*, 686 N.W.2d 164, 180 (Iowa 2004) (Cady, J., dissenting) ("It nearly goes without saying that the doctrine of stare decisis is one of the bedrock principles on which this court is built. It is an important restraint on judicial authority and provides needed stability in and respect for the law."). We should not diverge from well-settled Federal Fourth Amendment precedent unless doing so is justified by differences in the text, structure, or history of the Iowa provision. *See generally State v. Schwartz*, 689 N.W.2d 430, 438–45 (S.D. 2004) (Konenkamp, J., concurring in result) (discussing need for neutral divergence standards). No such grounds for divergence exist in this case.

**III. Deputy Wubben Did Not Impermissibly Expand the Scope of His Investigation.**

The majority concludes Pals did not preserve for review the claim Wubben improperly expanded the scope of his investigation by asking to search without a reasonable suspicion. I will nevertheless address this issue to respond to the majority's dicta. The majority incorrectly asserts federal courts are "divided" on this issue and overlooks controlling Fourth Amendment decisions by the United States Supreme Court in the last six years: *Arizona v. Johnson,* 555 U.S. 323, 333–34, 129 S. Ct. 781, 788, 172 L. Ed. 2d 694, 704 (2009); *Muehler v. Mena,* 544 U.S. 93, 100–01, 125 S. Ct. 1465, 1471–72, 161 L. Ed. 2d 299, 308–09 (2005); *Illinois v. Caballes,* 543 U.S. 405, 410, 125 S. Ct. 834, 838, 160 L. Ed. 2d 842, 848 (2005). The majority also fails to mention our decision in *State v. Smith,* 683 N.W.2d 542, 546–48 (Iowa 2004), which is directly on point.

I would adopt the well-reasoned court of appeals opinion that applies this court's decision in *Smith,* as well as *Johnson, Muehler,* and *Caballes* to reject Pals' contention that Deputy Wubben unconstitutionally expanded the scope of his investigation by asking for permission to search the vehicle. *State v. Pals,* 2010 WL 447322, **6–7 (Iowa Ct. App. 2010).

This court unanimously decided *Smith* seven years ago. *Smith* is dispositive. Under *Smith,* and now-settled Federal Fourth Amendment caselaw (*Johnson, Mena,* and *Caballes*), merely asking permission to search is not a seizure. We could not hold Wubben unconstitutionally expanded the scope of his investigation without overruling *Smith.* This case involves no allegation of profiling (Pals is Caucasian)—a justification other courts have relied on to prohibit police from expanding the scope of their search absent reasonable suspicion. Nor does the record include

any evidence of profiling by Iowa law enforcement. There is no valid reason to overrule *Smith*.

## V. Conclusion.

For the foregoing reasons, I would affirm the decisions of the district court and court of appeals.